**In re Michael HAT, dba Michael Hat Farming Company, Debtor.**

**The Wine Group, Bank of the West and the Official Committee of Unsecured Creditors, Movants,**

v.

**Sharon Diamante and Phoenix Bio Industries, Inc., Respondents.**

No. 01–92886–A–11.

United States Bankruptcy Court, E.D. California, Modesto Division.

Feb. 6, 2004.

William W. Nolan, Sacramento, CA, for Michael Hat, dba Michael Hat Farming Company.

Mary J. Martinelli, Sacramento, CA, Merle C. Meyers, San Francisco, CA, for John Van Curen.

### MEMORANDUM DECISION

THOMAS C. HOLMAN, Bankruptcy Judge.

Moving parties ask the court to reconsider an order (the "Sale Order") entered October 1, 2003 (Docket No. 2099) approving the sale of property of the estate in Kern County, California, consisting of a grape crush and winery facility on approximately 20 acres of land, approximately 130 additional acres planted to vineyard, approximately 170 additional acres of open land and related personal property (collectively, the "Capello Winery"). Sharon Diamante ("Diamante"), the purchaser designated in the Sale Order, opposes the motion to reconsider. For the reasons stated herein, the court grants the motion, vacates the Sale Order and orders a new sale of the Capello Winery.

The court held an evidentiary hearing in Modesto, California on January 22, 23, 29, and 30, and February 6, 2004. Appearances were noted on the record. At the conclusion of the evidentiary hearing, the matter was taken under advisement.

This is a core proceeding and the court has jurisdiction over this matter. 28 U.S.C. §§ 1334 and 157. Venue is proper in this court under 28 U.S.C. § 1409. There is no dispute concerning jurisdiction or venue.

The following constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 7052.

## PROCEDURAL HISTORY

On July 20, 2001, Michael Hat ("Hat") commenced the above-captioned voluntary Chapter 11 case. Hat acted as debtor in possession until April 11, 2003, when John Van Curen, (the "Trustee") was appointed Chapter 11 trustee.

On June 13, 2003, the Trustee filed Trustee's Motion For: Authority To Sell The Capello Winery Free And Clear Of Certain Interests In The Property With Contingent Lease, Approval Of Overbid Procedures, And Authorization To Pay A Breakup Fee In The Event Of Sale To Third Party, D.C. No. LRP–6, (the "Sale Motion") to sell the Capello Winery to The Wine Group ("TWG"). A hearing on the Sale Motion was held on July 8, 2003. The court granted the Sale Motion in part, approving a requested one year lease of the Capello Winery to TWG. The court continued the balance of the Sale Motion to July 22, 2003 for further hearing. The

court required the Trustee to file and serve an executed sale agreement by July 11, 2003. An order reflecting the July 8, 2003 rulings was entered July 14, 2003.

Another hearing on the Sale Motion was held on July 22, 2003. TWG increased its prior bid of $4.75 million by the amount of $142,500, for a proposed purchase price of $4,892,500. The break up fee requested in the Sale Motion was approved by the court. There were no other bids.

The Court approved the sale to TWG. Diamante, the former spouse of Hat, asserted that the Capello Winery was community property and that she had the right under 11 U.S.C. § 363(i)[1] to purchase the Capello Winery by matching the TWG purchase price.[2]

The Court approved the sale of the Capello Winery to Diamante, as purchaser, at the purchase price of $4,892,500.

On August 29, 2003, TWG filed the present motion to reconsider. The motion to reconsider included a request that the court delay the entry of the Sale Order pending a hearing on the motion to reconsider.

At a hearing on the motion to reconsider held September 30, 2003, the court denied the motion to reconsider in part, specifically the request for a delay in the entry of an order based on the ruling at the July 22, 2003 hearing. That request was denied without prejudice to a motion seeking a stay of the effect of the Sale Order. However, the effect of the Sale Order was temporarily stayed until October 28, 2003 to allow TWG to file and have its stay motion heard. The balance of the motion to

---

1. Unless otherwise noted, all statutory references are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

2. Whether or not Diamante possesses rights under Section 363(i) is the subject of an ad-

versary proceeding currently pending in this court: 03–9178–A. However, the Trustee conceded the existence of Diamante's Section 363(i) rights for purposes of the Sale Motion at the initial hearing held July 8, 2003.

reconsider was set for evidentiary hearing. An interim order to the foregoing effect was entered October 6, 2003.

As noted above, the Sale Order approving the sale to Diamante was entered October 1, 2003. On October 10, 2003, TWG timely filed its motion for a stay of the effect of the Sale Order (the "Stay Motion").

On October 28, 2003, the court heard the Stay Motion and stayed the effect of the Sale Order pursuant to Federal Rule of Bankruptcy Procedure 7062 incorporating Federal Rule of Civil Procedure 62(b), until such time as the court decided the motion for reconsideration. The court entered an order on the Stay Motion on November 5, 2003.

The Trustee withdrew his opposition to the motion for reconsideration on October 24, 2003, after obtaining a written offer from TWG to purchase the Capello Winery for $5,250,000 should the motion be granted and the prior sale vacated.

After a discovery period, a pre-trial conference was held December 18, 2004. Diamante's oral motion to exclude testimony on all issues other than whether Phoenix Bio Industries ("PBI") was a potential bidder at the sale was denied. The Trustee and Jerry Rava were dismissed as parties. The parties stipulated to a single list of exhibits and to their admission into evidence. There were also stipulations regarding allocation of time and to limiting the number of times that the same witness would be called to testify. The court set this matter for a four day trial on January 22, 23, 29, and 30, 2004.

The court heard from a total of twelve witnesses on the first three days of trial. When the matter recommenced on January 30, 2004, the parties notified the court that they had concluded presentation of their cases in chief. The trial was continued to February 6, 2004 for closing arguments after the conclusion of which, the matter was taken under submission.

## FACTS

The Capello Winery consists of approximately 320 acres of land on which a grape crush and winery facility occupies 20 acres; approximately 130 acres are planted to vineyard; and 170 acres is open land. The crush and winery facility also houses a distillery. The facility contains one hundred seven (107) stainless steel storage tanks of various capacities ranging from 350,000 gallons to 2,500 gallons. The total tank capacity is approximately 8.97 million gallons.

In 2002, PBI was in the business of producing non-food grade grain alcohol. It believed that the stainless steel tanks on the winery portion of the Capello Winery could be converted into fermentation tanks for grain and that those tanks could produce enough grain mash to keep the distillery busy around the clock, seven days a week.

In May, 2002, while Hat was debtor in possession in this bankruptcy case, PBI and Hat entered into a lease of the Capello Winery; however, no bankruptcy court approval of the lease was sought or obtained. PBI invested approximately $514,574.00 in the Capello Winery in the belief that its lease was valid. In March 2003, prior to appointment of the Trustee, PBI submitted to Hat a written offer to purchase the Capello Winery for $2.5 million. That offer was rejected.

After his appointment on April 11, 2003, the Trustee began actively marketing the Capello Winery. The Trustee thought time was short because Yosemite Land Bank, the holder of the first deed of trust on the property, had not been paid for some time and was about to seek relief from the automatic stay to foreclose. The

Trustee's analysis indicated that the estate needed at least $4.5 million from the property to cover the Yosemite Land Bank lien, costs of sale, estate attorneys fees relating to a sale transaction, potential capital gains taxes and a return for other estate creditors.

PBI learned that its lease was potentially vulnerable because it had not been approved by the bankruptcy court.

On or around April 20, 2003, Richard Eastman ("Eastman") of PBI contacted the Trustee about acquiring the Capello Winery. PBI was motivated by the desire to protect its investment in the facility and by the desirability of the facility for its business. PBI made an oral offer to the Trustee to purchase the Capello Winery for $4.1 million. The Trustee told Eastman that a purchase offer would have to be more than $4.5 million.

PBI began the process of putting together a combination of financing and investors to acquire the Capello Winery. PBI got a commitment from Mark Wheeler, one of the principals of PBI, to invest up to $2.5 million for the acquisition. Wheeler's limit for the investment was $2.5 million. PBI also sought additional financing of between $3.0 million and $4.0 million from Wells Fargo Bank and other financial institutions. In a letter to Wells Fargo Bank, Eastman stated that he had offered the Trustee $4.1 million for the Capello Winery. PBI also sought investors for additional funds. PBI's efforts to find funds to acquire the Capello Winery continued until mid-June, 2003.

TWG entered the picture at the beginning of May 2003. Kenneth Ford ("Ford"), president of winery operations for TWG, had contacted the Trustee on May 5, 2003. Ford and the Trustee met in person on May 6, 2003 and, after some negotiation, agreed that TWG would purchase the Capello Winery for $4.75 million.

In the latter half of May 2003, PBI first learned that TWG was interested in the Capello Winery. On May 15, 2003, Ford and others from TWG toured the Capello Winery with the Trustee. During the tour, Eastman, who was on the property that day, introduced himself to Ford. Through general knowledge of the industry, PBI believed that TWG had far greater resources than PBI and that TWG could outbid PBI in a competitive sale.

On June 5, 2003, Eastman contacted Kenneth Ford of TWG for a meeting. PBI wanted to work out a deal with TWG to avoid competitive bidding. In preparation for the meeting, Eastman generated a proposed agenda. That document explicitly states in item A1: "Purchase price can be kept down by avoiding serious overbid situation." Ford initially agreed to meet with Eastman, but after consulting with counsel, he cancelled the meeting on June 9, 2003.

On or about June 10, 2003, Hat informed Eastman that Diamante had a right of first refusal under the Bankruptcy Code. Eastman followed up with Hat in a letter attaching the same agenda he had prepared for the cancelled TWG meeting. The meeting with Hat was successful. The parties agreed in principal to a deal whereby Diamante would exercise her rights under Section 363(i) in exchange for a three percent (3%) commission on the sale. Immediately after the sale closed, Diamante would assign her rights to the Capello Winery to PBI subject to a future right of her or her assignee to re-purchase a 50% interest in the property. However, the parties agreed that Diamante was serving as a middle person for a fee and would ultimately have no ownership of the property because any final agreement would require her to assign her rights to Hat.

Upon reaching the foregoing agreement, PBI ceased its efforts to secure financing and investors to bid on the Capello Winery.

As ultimately drafted, the Memorandum of Understanding Concerning the Capello Winery ("MOU") provided that Diamante would be paid $72,500 from PBI and $72,500 from the Hat Group to exercise her Section 363(i) rights. PBI agreed to provide one-half of the funds for both the deposit and the final purchase price. The other half of the funding was to come through the so called Hat Group.

Diamante and Hat approached various relatives and business associates. They obtained an informal commitment from her and Hat's nephew, Lance Ioppini, to loan up to $2 million.[3] The Ravas, who had no interest whatsoever in running a winery, agreed to lend Hat (but not Diamante) $250,000 because Hat made it a condition of obtaining his help on another matter. They wished to purchase other estate property located in Monterey county, then involved in a pending foreclosure, and thought they needed Hat to sign off on the purchase. Hat first broached the idea of the loan the day before the July 22 hearing. The Ravas agreed to loan Hat the money for 45 days in exchange for him signing off on the Monterey county properties. The money would be non-refundable if Hat signed off on the purchase.

The remainder of the Hat group's portion of the funding was to come through either an assumption or refinance of the debt owed to the first deed of trust holder, Yosemite Land Bank, FLCA. The court notes that an assumption of existing debt was outside the scope of the sale agreement between the Trustee and TWG.

The MOU was executed by PBI, Diamante, and Hat on July 22, 2003, immediately prior to the hearing on the proposed sale of the Capello Winery. At the same time, an assignment of rights between Hat and the Ravas was signed by Hat, Diamante, and PBI. Neither of the Ravas signed the document despite the fact that it contained lines for their signatures. No evidence was presented of an assignment between Diamante and Hat.

The method by which Diamante proposes to fund her purchase of the Capello Winery has changed significantly since the entry of the Sale Order on October 1, 2003. Neither PBI nor the Ravas are willing to finance or otherwise participate in the purchase. PBI is no longer operating and has no assets with which to fund the purchase. The Ravas allege they were defrauded by Hat and have demanded return of their $250,000.

Diamante testified that she proposed to form a limited liability company ("LLC") which would own the Capello Winery. Thirty percent (30%) of the LLC would be owned by a Dr. Paregian in exchange for a $1.5 million investment. Thirty Percent (30%) would be owned by a Mr. Pistoresi who would also invest $1.5 million. The final forty percent (40%) would be owned by Diamante. She proposes to fund her portion of the purchase through a $1.1 million loan from Hat's sister and the estate of Hat's mother as well as investing an undisclosed amount of crop proceeds from other properties owned by Diamante. The last $500,000 consists of the monies already placed in escrow by PBI and the Ravas.

---

**3.** The testimony is inconsistent as to which of Diamante or Hat actually spoke with Mr. Ioppini. Mr. Ioppini stated in his testimony that he spoke only with Diamante. Diamante, in her deposition testimony, answered "No" when asked whether she "had any idea at all of who these investors might be."

## Analysis

The motion is granted to the extent set forth herein. The sale of the Capello Winery has been tainted by collusion between Diamante and potential bidders, and the order approving the sale of the Capello Winery to Diamante is vacated.

## Standing

As an initial matter, Diamante raises the issue of TWG's standing to bring this motion. Diamante argues that this motion is really a motion under Section 363(n) and actions under that section may only be brought by a trustee. Diamante's argument is unpersuasive.

■■■ "[A]n unsuccessful bidder—whose pecuniary loss is the speculative profit it might have made had it succeeded in purchasing property at an auction—usually lacks standing to challenge a bankruptcy court's approval of a sale transaction." *Kabro Associates v. Colony Hill Associates (In re Colony Hill Associates)*, 111 F.3d 269, 273 (2nd Cir.1997) (citation omitted). However this rule is not absolute.

> "Courts ... properly entertain suits challenging the equity of a bankruptcy sale transaction, on the assumption that sales tinged by fraud, mistake or unfairness would generally result in an accepted bid below that which might have been expected in a fair, free market situation. Thus, when an unsuccessful bidder attacks a bankruptcy sale on equitable grounds related to the intrinsic structure of the sale, he brings himself within the zone of interests which the Bankruptcy Act seeks to protect and to regulate."

*Id.* at 274 *citing In re Harwald Co.*, 497 F.2d 443, 444–45 (7th Cir.1974) (internal citations omitted). *See also Ross v. Kirschenbaum (In re Beck Industries, Inc.)*, 605 F.2d 624, 634 n. 13 (2nd Cir.1979).

This is one such instance. TWG is attacking the sale not because it lost a bidding contest with another party but because it alleges that two potential bidders colluded with a third party who held a statutory right of first refusal thus tainting the sale. The court finds that TWG has standing to bring this motion for reconsideration.

## Propriety of the Capello Winery Sale

Diamante correctly argues that she is not a bidder, holding (for purposes of the Sale Motion and this motion) a right of first refusal, but that does not exclude her from the scrutiny of the court. The very existence of her rights under Section 363(i) leads to certain chilling of the bid process. This fact was known and acknowledged by Congress at the time it enacted Section 363(i). By implication, it is therefore not grounds, in and of itself, for setting aside the sale. However, in this instance, the bidding has been further chilled by the agreement between Diamante and at least two potential bidders. The latter chilling is not inherent in the statute and is not permitted.

■■■ This court agrees with the bankruptcy court in *In re Fehl*, 19 B.R. 310, 311–12 (Bankr.N.D.Cal.1982) regarding the three factors to consider in circumstances such as this:

1. The integrity of the trustee's sale.

2. The 363(i) rights of the [spouse].

3. The preservation of the best interests of the estate.

The agreement between Diamante, PBI and Hat directly and negatively affects the first and third factors, and it goes beyond the legitimate interest acknowledged by the second factor.

## Sale Integrity

The evidence shows that the sale of the Capello Winery was tainted. Bidding was

chilled through collusion between Diamante and two potential bidders: PBI and Hat. The conclusion that bidding has been impermissibly chilled dictates a new sale. *Beck Industries*, 605 F.2d at 637.

As conceded by all parties in pre-trial briefing, potential bidders are "all persons who are contemplating making an offer to purchase property of a bankrupt estate that the trustee seeks to sell, whether such sale be private or at public auction." *Ramsay v. Vogel*, 970 F.2d 471, 473 (8th Cir.1992). The court specifically notes that the definition is not limited to parties who believe they will necessarily be the successful bidder at the sale. PBI was not merely a potential bidder. The evidence shows that PBI actually made an offer of $2.5 million in March 2003 and an offer of $4.1 million in April 2003.[4] PBI continued to look for independent financing and investment totaling at least $5.5 million to $6.5 million through mid-June, 2003; ceasing its search only after it had entered into the agreement with Diamante and Hat. PBI was at least a potential bidder for the Capello Winery.

Likewise, the evidence shows that Hat was also a potential bidder. Hat was the driving force behind the non-PBI half of the purchase. While at first blush it might seem that Hat was serving as Diamante's agent in the transaction, a review of actions taken by Hat directly contrary to Diamante's interests shows that Hat was acting for himself. Hat sought to arrange the transaction so that Diamante would serve as a middle person whose sole function was to exercise her Section 363(i) rights for a fee. While that may not have been Diamante's intent, that was the structure of the agreement.

Hat made all contacts with potential investors. It was Hat who first contacted PBI. Hat first contacted the Ravas. He structured the financing in place at the time of trial, and while he allegedly would not hold an ownership interest, he would run the Capello Winery for a "hefty salary." There can be no doubt of Hat's interest in retaining control of the property. Other than being a party to the contract, there is no reason for Hat to sign the July 22, 2003 Memorandum of Understanding.

There is no disputing that Diamante, PBI and Hat colluded. The evidence also shows that their collusion controlled the price at which the Capello Winery sold. "[T]he term 'control' implies more than acts causing an incidental or unintended impact on the price; it implies an intention or objective to influence the price." *Lone Star Industries, Inc. v. Compania Naviera Perez Companc, et al. (In re New York Trap Rock Corp.)*, 42 F.3d 747, 752 (2nd Cir.1994). The June 10, 2003 meeting agenda is particularly damning in that it expressly sets forth an intent to minimize the price. Ultimately, TWG was the only actual bidder at the sale. Both Hat and PBI sat on the sidelines behind Diamante's right of first refusal. Their control results from their ability to utilize Diamante's rights to obtain the property without having to bid at all.

### Diamante's Section 363(i) Rights

The Trustee conceded the existence of these rights as to the Capello Winery at the initial hearing on the Sale Motion. The court takes no issue with Diamante's desire to utilize her right of first refusal to purchase the Capello Winery, provided that her rights are properly exercised.

---

**4.** Eastman's testimony at trial that PBI did not make the $4.1 million offer is not credible in light of the contemporaneous documents executed by him and sent to Wells Fargo Bank.

■ The holder of Section 363(i) rights may exercise those rights while obtaining financing from a lender that is not a potential bidder. Similarly, as a general matter, "bidding is not improperly chilled by the mere fact of an association of persons formed for the purpose of bidding at a sale since this may be not only unobjectionable but oftentimes meritorious, if not necessary to enable the persons associating themselves to participate in the bidding, rather than to shut out competition." *Beck Industries,* 605 F.2d at 635–36 (internal quotes and citation omitted).

A problem arises when, as here, the financing and/or association has the purpose and effect of removing potential bidders from the sale process.[5] In such circumstances, the Section 363(i) rights are not properly exercised.

### Preservation of the Best Interests of the Estate

■ The best interests of the estate were directly and negatively impacted by Diamante's collusion with PBI and Hat and the way in which Diamante exercised her Section 363(i) rights in this instance. The purpose of Section 363(i) is to give a non-debtor spouse the right to purchase property under the same terms and conditions as the winning bidder after the auction process has determined the fair market value. If the procedure works correctly, the estate is not harmed because it still receives the highest price the market will bear. The non-debtor spouse benefits by being able to retain the community property.

Here, there were only three potential bidders for the Capello Winery. Diamante entered into an agreement with two of the

three. As a direct result, there was no competitive bidding.[6] The auction was improperly restrained and therefore could not determine the fair market value for the Capello Winery. No one can state with certainty what the ultimate price would have been had competitive bidding taken place. However, the facts that PBI attempted to put together its own financial package in excess of $5.0 million before it learned of Diamante's rights, and that TWG is now willing to bid at least $5,250,000, $357,500 more than the present sale price, create a strong indication that an auction with true competitive bidding would produce a higher price. Diamante's agreement has harmed the estate.

### TWG's Request for Future Restrictions on Diamante's Exercise of Section 363(i) rights

■ TWG requests that Diamante be barred from any exercise her Section 363(i) rights in any future sale of the Capello Winery. In connection with that request and assuming that it is granted, TWG seeks an order that no potential bidders (Diamante included) may collude or cooperate in bidding on the sale. Those requests are denied.

TWG has provided no authority for this court to strip Diamante of her Section 363(i) rights. *Beck Industries* is factually distinguishable. That case involved a right of first refusal ("ROFR") in an employment contract made during a bankruptcy case with court approval. The decision suggests that the court's actions regarding the ROFR holder's participation in the new sale were based on the court's supervisory role over the court approved contract. *Beck Indus-*

---

5. The court need not address either an improper purpose or an improper effect, standing alone, as both are clearly present here.

6. The court acknowledges that TWG did overbid itself but it is clear that the only purpose was to become eligible to receive the negotiated break-up fee. In essence, TWG was to be repaid the bid increase.

*tries,* 605 F.2d at 637. More importantly, the court in *Beck Industries* did not strip the holder of the ROFR of his rights. Rather, the court directed and suggested certain restrictions on the exercise of those rights. *Id.*

*Beck Industries* clearly stands for the proposition that the court may fashion equitable remedies for misconduct in connection with a sale that subjects the bankruptcy estate to expense and delay, the objective being to maximize bidding, not restrict it. Thus, the court in *Beck Industries* said:

> We also direct that [the holder of the ROFR] shall not be allowed, after all that has here transpired, to interpose his [ROFR] on the [assets on which the ROFR was held] as a bar to the sale of the package [the assets on which the ROFR was held and other assets] and require a separation.

> \* \* \*

> Any legitimate interest of [the ROFR holder] can be protected by the bankruptcy judge's giving him a reasonable opportunity to meet any bid for the package, with the bidder then having an opportunity to make a still higher bid.

*Id.*

This court is indifferent to the identity of the purchaser of the Capello Winery, whether it is TWG, Diamante, or some other third party, so long as the sale process remains within the boundaries set by the Bankruptcy Code and the estate receives the highest price possible. To those ends, the court orders two things. First, Diamante shall make full disclosure in writing at the commencement of the subsequent sale of the identities of all investors, co-owners and sources of financing in connection with any bid or exercise of Section 363(i) rights that she may make at the subsequent sale of the Capello Winery.

The court has previously ordered similar disclosure by Diamante on other sale motions, and the disclosure allows the Trustee, the Creditors Committee and other parties in interest to examine any arrangements before confirmation of the sale. Second, the high bidder prior to Diamante's first exercise of her Section 363(i) rights may thereafter raise its bid, the process to continue until either the bidder fails to raise its bid or Diamante fails to exercise her Section 363(i) rights. These provisions will ensure the highest price for the estate while preserving Diamante's right to meet, but not exceed, the highest bid.

The court will not place any additional restrictions on potential bidders. Collusion between or among bidders and potential bidders to control the price at a sale is already proscribed. 11 U.S.C. § 363(n). The court need not duplicate that proscription.

### Conclusion

Based on the forgoing, the motion for reconsideration pursuant to Federal Rule of Bankruptcy Procedure 9023 incorporating Federal Rule of Civil Procedure 59(e) is granted. The Sale Order is vacated and the Trustee shall conduct another sale of the Capello Winery in a manner consistent with this ruling.

The court will issue a separate order.